UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-11439-GAO

JAMES MACDONALD,
Plaintiff,

v.

MICHAEL ASTRUE,
Commissioner of the Social Security Administration,
Defendant.

OPINION AND ORDER
September 27, 2011

O'TOOLE, D.J.

The plaintiff, James MacDonald, appeals the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying MacDonald's application for Social Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI"). MacDonald applied for SSDI and SSI benefits on June 12, 2008, claiming he became disabled on October 15, 2007. (Administrative Tr. at 122, 126 [hereinafter R.].) On August 22, 2008, the Social Security Administration ("SSA") denied his initial application. (Id. at 72, 75.) On September 18, 2008, MacDonald filed a request for reconsideration of the denial. (Id. at 78.) On December 9, 2008, the SSA notified MacDonald that the denial had been upheld. (Id. at 79, 82.) MacDonald timely appealed to an administrative law judge ("ALJ") on January 27, 2009, (id. at 85-86), and a hearing was held before the ALJ on February 22, 2010, (id. at 25, 99). MacDonald and a vocational expert testified at the hearing. (Id. at 24.) The ALJ issued a written decision on April 7, 2010, finding that the extent of MacDonald's medical impairments did not constitute a disability under the Social Security Act. (Id. at 12-16, 18.) The ALJ's decision became the final

decision of the Commissioner. (Id. at 1.) On August 20, 2010, MacDonald appealed to this Court pursuant to 42 U.S.C. § 405(g). Before the Court are cross-motions to reverse, and alternatively to affirm, the decision of the Commissioner. Concluding that the administrative record substantially supports the ALJ's decision and that no error of law was made, the Court now affirms.

## I.      Factual Background

MacDonald was forty-six years old at the time of the onset of the claimed impairments. (Id. at 16.) He had a high-school education. (Id. at 16, 29.) His prior relevant work experience was predominately as a cab driver. (Id. at 50.) He is unmarried, has no dependents, and lives alone. (Id. at 29.) He frequently performs light household tasks but receives assistance from his parents with more laborious tasks. (Id. at 39-40.) MacDonald's source of income at the time of the ALJ hearing was composed of monthly welfare benefits in the amount of $500 and parental assistance for housing, utility, and transportation costs. (Id. at 30.) He last engaged in substantial employment on October 15, 2007, the same day his disability allegedly began. (Id. at 9, 31.) He claims disability due to hypertension, high blood pressure, diabetes, poor vision, carpal tunnel syndrome, and severe side effects from his medications. (Id. at 27-28.)

MacDonald's relevant medical history is as follows: He was admitted to the Whidden Memorial Hospital on September 28, 2007 after experiencing headaches, numbness and tingling on the right side of his body, and tingling in his fingers. (Id. at 186.) MacDonald was diagnosed with malignant hypertension, treated for his symptoms, informed about a subsequent treatment plan, and released on October 2, 2007 in stable condition. (Id. at 186-88.) He was also incidentally diagnosed with diabetes during the course of his primary examination. (Id. at 187.)

MacDonald's first visit with his primary care doctor, Dr. Deborah Erlich,[1] occurred on October 4, 2007. (Id. at 224.) During the appointment, Dr. Erlich observed that MacDonald's hypertension was "still dangerously high, though now asymptomatic." (Id.) Dr. Erlich remarked that his diabetes condition was "doing well" and that he had lost three pounds as a result of a diabetic diet and walking. (Id.) MacDonald agreed to a treatment plan proposed by Dr. Erlich, requiring daily medication, cessation of tobacco use, and an improved diet. (Id. at 224-25.)

MacDonald's next appointment with Dr. Erlich occurred on November 27, 2007. (Id. at 220-22.) MacDonald had not taken his prescribed medications for four to five days prior to the appointment. (Id.) He said he had been experiencing "good [and] bad days" since his last appointment, but such "bad days" had occurred only four times over the course of the prior seven weeks. (Id. at 220.) Dr. Erlich noted MacDonald's diabetic condition was "much better." (Id. at 221.) Dr. Erlich continued to stress the importance of smoking cessation, healthy diet, and proper exercise. (Id.) MacDonald stated that he had not been exercising because of a "stressful nocturnal lifestyle" resulting from "work[ing] nights." (Id. at 220.) However, he demonstrated an interest in following the treatment plan and committed to quit smoking by December 31, 2007. (Id. at 221.)

On January 2, 2008, MacDonald met with Dr. Claudia Legere. (Id. at 218.) Again, MacDonald had not taken his medication for three days prior to the appointment. (Id.) Nonetheless, he was observed not to be suffering from headaches, dizziness, chest pain, changes in vision, or other symptoms of high blood pressure, although he did note numbness in his fingers, which was somewhat alleviated by wearing a wrist brace. (Id.) On January 14, 2008,

---

[1] During the course of MacDonald's treatment, Deborah Erlich changed her name from Deborah Rin to Deborah Erlich. The record contains references to both names. For purposes of clarity, she will be referenced hereinafter as "Dr. Erlich."

3

MacDonald visited Dr. Legere again, at which time his condition was mostly similar to his prior visit, with the addition of a complaint of blurriness in his right eye. (Id. at 217.) MacDonald followed up with Dr. Erlich on January 22, 2008. (Id. at 214.) Dr. Erlich noted that MacDonald's blood pressure had improved. (Id. at 215.) MacDonald mentioned he experienced no headaches or chest pain, but noted "some dizziness" and continued numbness and tingling sensation in his hands. (Id.) MacDonald stated that he continued to experience vision problems, but had recently cancelled an eye doctor appointment. (Id. at 214, 216.) Dr. Erlich again stressed the importance of smoking cessation, increased exercise, and proper diet. (Id. at 214.)

MacDonald met with Dr. Steven Patalano, an eye doctor, on February 1, 2008. (Id. at 305.) MacDonald reported he began experiencing blurry vision after he stopped taking his medications. (Id.) Dr. Patalano conducted a retinal examination and concluded that MacDonald's vision was 20/25 in his left eye and 20/80 in his right eye. (Id.) Dr. Patalano suggested that MacDonald's eye problems may be related to his hypertension and diabetic conditions. (Id. at 307.)

MacDonald again met with Dr. Erlich on March 7, 2008. (Id. at 212.) She observed that his blood pressure was "much better." (Id. at 213.) His weight remained stable and his diabetes continued to be "doing well." (Id. at 212.) MacDonald complained that he continued to experience pain, numbness, and tingling in his right hand. (Id.) Dr. Erlich observed his right hand strength to be only eighty percent as strong as his left hand. (Id.)

MacDonald's next appointment with Dr. Erlich occurred on May 2, 2008. (Id. at 209.) Dr. Erlich stressed that smoking cessation was the "most important issue to address for [MacDonald's] health." (Id.) He cut down his daily smoking from three packs to a half pack (Id.) Dr. Erlich scheduled a renal magnetic resonance angiography ("MRA") to determine whether a

4

secondary cause of malignant hypertension existed. (Id.) The MRA was performed on June 6, 2008, but was non-diagnostic due to inaccurate contrast. (Id. at 266.) The test was repeated on June 20, 2008 but again non-diagnostic due to a motion artifact. (Id. at 262.)

On May 16, 2008, Dr. Erlich again examined MacDonald. (Id. at 207.) She observed an increase in blood pressure, and adjusted his medication plan accordingly. (Id.) MacDonald discussed feeling increased numbness and tingling in his right hand. (Id.) Dr. Erlich surmised the cause may be carpal tunnel syndrome, inflammation, or the result of physical activity while driving. (Id.) She recommended MacDonald try prescription strength ibuprofen to remedy discomfort. (Id.)

On the same day, Dr. Patalano confirmed a diagnosis of hypertensive retinopathy. (Id. at 303.) Dr. Patalano's test results indicated 20/80 vision in MacDonald's right eye. (Id.) Dr. Patalano's records indicate that MacDonald's "vision [was] getting better," but was still blurry. (Id.)

On June 16, 2008, Dr. Erlich observed that MacDonald's diabetes was "well controlled," his blood pressure improved, and his hypertension was "better but not at goal." (Id. at 205.) He reported occasional sensations of numbness in his right foot. (Id. at 204.) Dr. Erlich continued to advise MacDonald to take ibuprofen for hand pain, and referred him to Dr. Debra Mulley, an orthopedist. (Id. at 205.)

On July 22, 2008, Dr. Mulley observed that MacDonald had a full range of motion in his wrist and 5/5 grip strength, but displayed symptoms consistent with carpal tunnel syndrome. (Id. at 283.) Dr. Mulley concluded the condition was unrelated to his stroke. (Id.) She advised MacDonald to stop taking ibuprofen, which "could [have been] account[ing] for his declining renal function and uncontrolled hypertension." (Id. at 283-84.) However, MacDonald continued

a regimen of ibuprofen, (id. at 341), despite Dr. Mulley's recommendation and a subsequent decision by Dr. Erlich to substitute the prescription ibuprofen with Tramadol, (id. at 352).

On September 5, 2008, Dr. Patalano noted that MacDonald had 20/80 vision in his right eye and referred him to Dr. Joseph Rizzo for a neurological eye examination. (Id. at 326.) On February 12, 2009, Dr. Rizzo reported that MacDonald's stroke had caused unilateral vision loss in his right eye, but that his vision had been unchanged since his first visit with Dr. Rizzo on October 30, 2008. (Id.) MacDonald's left eye was also tested and "showed a full visual field." (Id. at 326.) Dr. Rizzo confirmed diagnosis of non-arteritic anterior ischemic optic neuropathy, a condition where damage to the optic nerve results in vision loss, and prescribed polycarbonate lenses. (Id. at 327.)

On January 31, 2009, Dr. Nicholas Nguyen evaluated MacDonald and determined his hypertension was stable, but poorly controlled. (Id. at 363.) Dr. Nguyen's assessment indicated MacDonald's hypertension required further observation and improvement. (Id.) Dr. Nguyen stressed that MacDonald "needs to quit smoking" to improve his hypertension. (Id.) MacDonald told Dr. Nguyen that he had been compliant with taking his medication and he did not experience any "significant medication side effects." (Id.)

On March 18, 2009, Dr. Legere examined MacDonald. (Id. at 358.) She noted that his hypertension had improved and discussed reducing medication. (Id. at 359-60.) MacDonald expressed that with respect to his hypertension, he felt "the best [he had] been." (Id. at 360.) MacDonald reported right arm pain because he had fallen on that arm six weeks earlier and subsequently developed tendinitis. (Id. at 359.) He also described experiencing one episode of nausea and light-headedness after forgetting his medication, but he had not felt that way since. (Id. at 358.)

MacDonald next met with Dr. Erlich on April 24, 2009. (Id. at 351.) MacDonald complained of experiencing nausea three times a week, and had vomited earlier that morning. (Id. at 352.) Dr. Erlich surmised that the nausea and vomiting may be the cause of gastroparesis and advised MacDonald to continue to take previously prescribed gastrointestinal medications to combat the symptoms. (Id. at 354.) Dr. Erlich observed that MacDonald's hypertension was "well controlled" with no "significant medication side effects," although Dr. Erlich doubted whether MacDonald had been taking his medications daily. (Id. at 353.)

On May 28, 2009, MacDonald again met with Dr. Erlich. (Id. at 347.) He explained that his vomiting had become less frequent, but still occurred twice a week. (Id. at 349.) In response, Dr. Erlich prescribed an additional gastrointestinal medication for his nausea. (Id. at 350.) Dr. Erlich observed that MacDonald's hypertension and related symptoms continued to be "well controlled," with only "rare" instances of "transient" dizziness. (Id. at 348-49.)

MacDonald followed up with Dr. Erlich on July 28, 2009. (Id. at 344.) MacDonald claimed to have been taking his medications regularly as instructed. (Id.) He reported no feelings of dizziness or other side effects to the medication. (Id.) MacDonald complained of "some swelling [of his feet] when on [them] all day," but that his blood pressure medication was "helping." (Id.) He stated that his problems with vomiting and nausea had improved, and despite continued occurrences of diarrhea, he "[could] live with it." (Id.) Dr. Erlich considered "further paring down [his medication]," including Metformin which she suspected contributed to MacDonald's episodes of diarrhea. (Id. at 345.)

MacDonald's next appointment with Dr. Erlich occurred on September 8, 2009. (Id. at 340.) MacDonald reported that his nausea was "fine" due to the medications prescribed by Dr. Erlich. (Id. at 341.) He noted that he had experienced "no diarrhea" since decreasing his dose of

7

Metformin. (Id.) He complained of "new headaches" occurring "at night mostly." (Id.) Although ibuprofen "relieved" his headaches, Dr. Erlich instead prescribed Tylenol to avoid any conflict with the hypertension treatment. (Id. at 341, 343.) She made a referral to an eye doctor to address complaints of eye pain. (Id. at 342.) She increased the dosage of two existing medications to remedy MacDonald's complaints of increased swelling in his legs. (Id. at 341-42.)

MacDonald next followed up with Dr. Erlich on October 6, 2009. (Id. at 336.) MacDonald complained of continued eye pain. (Id.) Dr. Erlich suggested episodic therapy with Tylenol and Tramadol and use of cold packs while lying in a dark room to decrease MacDonald's continued headaches that had been occurring with a "low frequency of pain." (Id. at 336-37.) Dr. Erlich noted that MacDonald had again failed to show up for his eye doctor appointment. (Id. at 336-37.)[2] Dr. Erlich noted that the medication plan designed to treat MacDonald's nausea and vomiting had been effective and should be continued. (Id. at 338.)

MacDonald's last appointment noted in the record with Dr. Erlich occurred on November 20, 2009. (Id. at 332.) Dr. Erlich observed increased blood pressure due to MacDonald's failure to wear a medicated patch during the prior two to three weeks. (Id. at 333.) However, Dr. Erlich noted his blood pressure was still "borderline controlled" and an increase in medication would be possible if it remained high. (Id.) MacDonald made a new complaint about swollen breasts and a sore lump in his right breast, and was prescribed a new medication in response. (Id.) He reported a decrease in leg swelling, but continued "numbness [and] sensation loss" in his right hand and wrist, and right foot and shin. Dr Erlich referred MacDonald again to Dr. Mulley. (Id. 334.) Dr. Erlich continued to discuss and encourage proper diet and exercise. (Id.)

---

[2] The record suggests that MacDonald last attended an appointment with an eye doctor on February 12, 2009, at which time Dr. Rizzo prescribed corrective eyewear to address stabilized vision loss resulting from the stroke.

After MacDonald's application for SSI and SSDI benefits was initially denied, he asked Dr. Erlich to complete a questionnaire about his medical condition and what effect it may have upon his functional capacity. (Id. 308-11.) Dr. Erlich completed the questionnaire on November 7, 2008, concluding that MacDonald had no functional limitations interfering with his ability "to sit, stand, walk, lift, carry, hear, understand, [or] remember." (Id. at 311.) Later, in response to a request by the ALJ, Dr. Erlich submitted a Physical Residual Functional Capacity Questionnaire ("RFC") on January 22, 2010. (Id. 432-437.) Dr. Erlich concluded that MacDonald's symptoms were severe enough to frequently interfere with attention and concentration. (Id. at 433.)[3] Dr. Erlich determined MacDonald would be physically unable to sit continuously at one time for more than one hour or stand for more than fifteen minutes. (Id. at 434.) She opined that prolonged sitting would require that MacDonald's legs be elevated above his heart for thirty-three percent of an eight-hour working day. (Id.) With regard to the functionality of MacDonald's hands, Dr. Erlich stated that MacDonald would be unable to grasp, turn, or twist objects with his right hand for more than fifteen percent of the day, or with his left hand for more than twenty-five percent of the day. (Id. at 436.) She also stated that MacDonald would be unable to perform fine manipulations with the fingers of his right or left hand for more than fifteen percent of the day. (Id.) In her 2010 RFC evaluation, Dr. Erlich asserted that all these symptoms and limitations existed since 2008. (Id. at 437.)

Two non-examining physicians also completed RFC evaluations after reviewing MacDonald's records. On August 18, 2009, Dr. S. Ram Upadhyay noting MacDonald's diagnoses of hypertension, diabetes, and obesity, expressed the opinion that MacDonald could, during an eight-hour work day and with normal breaks, stand and/or walk for two hours and sit

---

[3] The RFC form defines "frequently" as between 34% and 66% of an eight-hour work day.

9

for six hours. (Id. at 286.) Additionally, he determined MacDonald could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds. (Id.)[4] On November 25, 2009, Dr. Marcia Lipski completed an RFC evaluation that agreed with Dr. Upadhyay's assessment, except that she suggested MacDonald was able to stand and/or walk for six hours in an eight-hour workday (Id. at 319.)

MacDonald testified at his hearing before the ALJ that he had not engaged in substantial employment since October 15, 2007 due to impairments including right hand pain, side effects from medications (e.g., dizziness, daily diarrhea, and vomiting), poor concentration, and difficulty getting along with other people. (Id. at 31-38.) MacDonald said he was able to wash dishes, shop for groceries, drive a car, and complete basic household cleaning tasks (Id. at 35, 39-40.) However, he claimed he was unable to do laundry, complete complex cleaning tasks, and sometimes had difficulty showering. (Id. at 39-40.) He stated that he spends his day watching television and sleeping. (Id. at 41.)

A vocational expert ("VE") testified that based on the evidence in the record as a whole, MacDonald would be able to perform light, unskilled, sedentary labor, including several specific positions which existed in the national and state economy. (Id. at 15, 50-53.) However, the VE testified that unscheduled bathroom breaks would not be tolerated in certain labor circumstances, depending upon their duration and frequency. (Id. at 54-56.) The VE testified that full-time employment would not be possible if hypothetically accepting the extent of MacDonald's functional limitations as depicted in Dr. Erlich's RFC and MacDonald's testimony. (Id. at 62-63.)

---

[4] The RFC form defines "occasionally" as between "very little" and 34% of an eight-hour working day.

After evaluating his condition under the five-step process required by 20 C.F.R. § 416.920, the ALJ determined MacDonald was not disabled. (Id. at 8-18.) The ALJ found that MacDonald suffered from diabetes, hypertension, carpal tunnel syndrome, vision loss, and obesity, all of which the ALJ characterized as severe impairments. (Id. at 9-10.) However, the ALJ did not find the intensity, persistence, and limiting effects of the impairments to amount to a disability. (Id. at 12-13.) The ALJ accorded little weight to the RFC submitted by Dr. Erlich, because she found it inconsistent with the evidence in MacDonald's medical records, including Dr. Erlich's own reports. (Id. at 15-16.) The ALJ concluded that although MacDonald could not return to work as a cab driver, he would be able to perform other jobs requiring only light, unskilled, and sedentary labor. (Id. at 16-17.) For those reasons, the ALJ concluded that MacDonald did not suffer from a disability, as defined in the Social Security Act. (Id. at 17.)

## II.   Standard of Review

The ALJ is responsible for determining whether the claimant is disabled. 20 C.F.R. § 416.927(e); see Rodriguez v. Sec'y of Health & Human Servs, 647 F.2d 218, 222 (1st Cir. 1981). A claimant may obtain review of the ALJ's final decision by filing a timely appeal with the district court of the United States in the judicial district in which the claimant resides. 42 U.S.C. § 405(g). This Court is required to accept the factual findings of an ALJ as conclusive if supported by "substantial evidence." Id.; Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996). The ALJ's decision will be upheld so long as a "reasonable mind" could, after reviewing the evidence, conceivably accept it as "adequate to support his conclusion." Rodriguez, 647 F.2d at 222-23. An ALJ's decision may be upheld, even where the evidence could rationally produce a competing conclusion. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).

The ALJ is responsible for making determinations of credibility and drawing permissible inferences from evidence. Rodriguez, 647 F.2d at 222. This Court must uphold such findings absent the presence of "legal or factual error[s]" in the ALJ's evaluation of the claim. Manso-Pizarro, 76 F.3d at 16 (citing Sullivan v. Hudson, 490 U.S. 877, 885 (1989)). The ALJ must consider all legitimate medical opinions along with the entirety of evidence in the record. 20 C.F.R. § 416.927(d). A treating physician's opinion is granted controlling weight if "well supported by medically accepted clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2).

### III. Discussion of Claimed Errors

MacDonald argues that the ALJ erred in finding he was not disabled. MacDonald advances two arguments to support this claim. First, he claims that the ALJ granted insufficient weight to Dr. Erlich's RFC and failed to provide an adequately detailed explanation for the decision. Second, MacDonald claims that the ALJ made a credibility determination regarding MacDonald's subjective complaints an adequately detailed explanation for the determination.

MacDonald first contends that the ALJ failed to grant adequate weight to Dr. Erlich's RFC opinion and gave no sufficient reasoning for refusing to do so. He claims the RFC was well supported by clinical and diagnostic evidence and consistent with other substantial evidence in the record, and therefore should be accorded controlling weight. He also claims the ALJ's decision should be reversed on grounds that the ALJ failed to specify detailed reasons for granting less weight to Dr. Erlich's opinion.

The ALJ properly noted that the assertions made in Dr. Erlich's RFC evaluation conflicted with her own contemporaneous treatment notes. Dr. Erlich's RFC evaluation suggested that the severity of MacDonald's impairments resulted in functional limitations

precluding the performance of full-time employment. (R. at 433-37.) This was a dramatic change from the disability report completed by Dr. Erlich a little over a year earlier in November 2008, which contained no suggestion that MacDonald's impairments imposed any significant functional limitation on his ability to perform work-related physical or mental activities. (Id. at 15, 311.) As the summary of Dr. Erlich's own treatment notes recounted above indicates, Dr. Erlich repeatedly noted satisfaction with MacDonald's blood pressure levels and lab results. Dr. Erlich regularly encouraged MacDonald to exercise more often and to quit smoking, (see id. at 202, 214, 221, 334), and closely monitored his medications, but there is little evidence in her notes that would suggest an assessment of disability as reflected in her 2010 RFC evaluation. The treatment notes regarding his carpal tunnel syndrome indicate that MacDonald experienced pain, numbness, tingling, and decreased grip strength, but gave no indication that such symptoms seriously impaired daily activities or were untreatable. (Id. 205, 212.) Overall, Dr. Erlich's own treatment notes depict a number of serious medical conditions, but there is no contemporaneous suggestion in the notes of the level of incapacitation suggested in the second RFC evaluation.

Notes from MacDonald's encounters with other doctors also provide little support for Dr. Erlich's RFC evaluation. None of the medical records indicate a severe decrease in both left and right hand functionality consistent with Dr. Erlich's RFC assessment that he was unable to manipulate even basic objects with his hands and fingers. Treatment notes from MacDonald's occasional evaluations by other doctors, are generally consistent with Dr. Erlich's treatment notes, rather than her RFC assessment.

The ALJ did not dispute that MacDonald suffered from severe impairments, but rather found that the impairments were not disabling. Although the ALJ included some examples of inconsistencies, the record as a whole demonstrated an incompatibility between Dr. Erlich's RFC

assessment and other medical evidence of record. For example, the ALJ did not dispute that MacDonald would be unable to perform certain work requiring prolonged standing or seating, but found that the extent of such impairments depicted in the RFC conflicted with Dr. Erlich's own treatment notes. (Id., 15-16.) Specifically, the ALJ could reasonably have concluded that the suggestion MacDonald could not continuously stand on his feet for longer than fifteen minutes did not comport with treatment notes suggesting that MacDonald lost weight from "walking more," (id. at 202), or noticed some swelling only after being "on [his] feet *all day*," (id. at 344) (emphasis added).

MacDonald also claims that the ALJ dismissed Dr. Erlich's RFC without a sufficiently specific explanation. Given the substantial evidence in the record conflicting with Dr. Erlich's RFC assessment, the ALJ exercised reasonable discretion in according it little weight. See Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991). The ALJ was not required to provide express findings for every inconsistency in the record. It was sufficient that substantial evidence in the record reasonably supported her conclusions. See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987). The ALJ did not err in deciding to grant little weight to Dr. Erlich's RFC evaluation.

With respect to his second argument, MacDonald contends that the ALJ failed to justify her rejection of the credibility of MacDonald's subjective claims regarding his impairments and symptoms. He argues the ALJ dismissed his subjective claims in a conclusory manner and without supporting substantial evidence. He particularly objects to an inference by the ALJ suggesting that ownership of a machine capable of making cigarettes demonstrates a capacity for dexterity.

The ALJ's determination that MacDonald's testimony was not entirely credible was reasonably based upon inconsistencies between MacDonald's subjective claims and substantial evidence in the record. For example, a reasonable mind could have agreed that MacDonald's use of a tobacco machine (or operation of an automobile) conflicted with testimony that his right hand was so impaired as to prevent him from adequately gripping a glass of water.[5] Further, MacDonald makes subjective claims that have no basis in the record. Nowhere does the record indicate that MacDonald's headaches detrimentally affected his concentration or memory, but rather the headaches were treatable and occurred with a "low frequency of pain." (Id. at 337.) The ALJ was not required to expressly state each inconsistency present between MacDonald's testimony and the record. See Frustaglia, 829 F.2d at 195. Rather, it was enough that a reasonable mind could doubt the credibility of MacDonald's testimony by viewing the record as a whole. See Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). Because the ALJ's conclusions were neither arbitrary nor unreasonable, the ALJ's credibility determination must be accorded appropriate deference and thus upheld by this Court. See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986).

MacDonald's claims regarding the severity and persistence of his symptoms may be further doubted by his decision not to fully pursue certain treatment plans suggested by his doctors. See Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 534 (1st. Cir 1988) (claimant did not meet burden of establishing that fibrosis impairment was not remediable where no course of treatment was taken for the impairment). While not as extreme as a failure to pursue

---

[5] MacDonald bases his opposition to the ALJ's credibility determination on the reference to the tobacco machine. However, the record contains numerous other inconsistencies from which a reasonable mind could reach the same credibility determination as made by the ALJ. For example, MacDonald testified that he held on to shower walls while bathing due to fear he would collapse, (R. at 40), however, a portion of his SSI and SSDI application specifically stated no difficulty with bathing or general personal care, (id. at 150).

*any* course of treatment, the ALJ reasonably doubted the credibility of MacDonald's claims regarding the severity and persistence of his impairments because he did not exhaust his treatment options or fully comply with the suggestions of his doctors. MacDonald's doctors noted he sometimes failed to take his medication, (R. at 300, 333, 352-55), and continued to smoke heavily, (id. at 353, 363). Despite being repeatedly advised that smoking cessation was imperative to improving his health, (id. at 209, 363), he refused to quit and continued to smoke a pack and a half a day, (id. at 333, 31). Although he complained of pain, numbness, and tingling in his hand, he refused to pursue surgical options, (id. at 349). Despite his subjective vision and hand usage complaints, he continued to operate his own automobile, (id. at 14), refused surgical options for his hand, (id. at 349), and no-showed to eye-doctor appointments and failed to follow their recommendations, (id. at 293, 326). Such evidence suggests that MacDonald's impairments were not as incapacitating as subjectively claimed.

The ALJ provided a sufficiently detailed basis for her credibility determinations regarding MacDonald's testimony. The ALJ's credibility determination was accompanied by a detailed symptom-by-symptom comparison of the subjective claims and substantial evidence in the record. (Id. at 13-15.) The ALJ was not required to explain the explicit reasons for every conclusion expressed in the opinion, nor would such a burden be logistically feasible. See Frustaglia, 829 F.2d at 195. The ALJ committed no reversible error in finding that MacDonald's subjective statements were not entirely credible.

## **IV.**     **Conclusion**

For the foregoing reasons, the plaintiff's Motion to Remand to Agency or Reverse (dkt. no. 9) is DENIED and the defendant's Motion for Order Affirming the Decision of the Commissioner (dkt. no. 12) is GRANTED. The Commissioner's decision is AFFIRMED.

It is SO ORDERED.

                                        /s/ George A. O'Toole, Jr.
                                        United States District Judge